**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VICENTE JUAN, Individually and On Behalf of All Others Similarly Situated, | Case No.: 19-cv-2720 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| AKORN, INC., RAJAT RAI, and DUANE A. PORTWOOD, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Vicente Juan ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Akorn, Inc. ("Akorn" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Akorn; and (c) review of other publicly available information concerning Akorn.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Akorn securities between May 2, 2018 and January 8, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Akorn purports to develop, manufacture, and market specialized generic and branded pharmaceuticals, over-the-counter drug products, and animal health products in the United States and internationally

3.      On January 9, 2019, Akorn announced that it had received a warning letter "dated January 4, from the U.S. Food and Drug Administration (FDA) related to an inspection of its Decatur, Illinois manufacturing facility in April and May of 2018." The warning letter from the FDA detailed a laundry list of "significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals."

4.      On this news, the Company's share price fell $0.46 per share, more than 11%, to close at $3.48 per share on January 9, 2019, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company's Decatur, Illinois facility exhibited severe manufacturing violations; (2) the Company's response to the FDA's Form 483, which identified certain observations following the

agency's inspections of the facility in April and May 2018, would be deemed inadequate; (3) the Company repeatedly failed to correct manufacturing violations at its Decatur, Illinois facility; (4) the manufacturing violations, as well as the Company's response to the FDA, would subject the Company to increased regulatory scrutiny; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

<u>JURISDICTION AND VENUE</u>

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

<u>PARTIES</u>

11.     Plaintiff Vicente Juan, as set forth in the accompanying certification, incorporated by reference herein, purchased Akorn securities during the Class Period, and suffered damages

as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Akorn, Inc. is incorporated under the laws of Louisiana with its principal executive offices located in Lake Forest, Illinois.  Akorn's securities trade on the NASDAQ exchange under the symbol "AKRX."

13.     Defendant Rajat Rai ("Rai") was the Chief Executive Officer of the Company from May 21, 2010, until his retirement on December 31, 2018, following Akorn's inability to salvage its takeover deal with Fresenius Kabi AG ("Fresenius").

14.     Defendant Duane A. Portwood ("Portwood") has been the Chief Financial Officer of the Company since October 30, 2015.

15.     Defendants Rai and Portwood (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS
### Background

16.     Akorn purports to develop, manufacture, and market specialized generic and branded pharmaceuticals, over-the-counter drug products, and animal health products in the United States and internationally.

17.     On May 16, 2018, the Food and Drug Administration ("FDA") issued a Form 483 to Akorn. The Form 483 documented health concerns that the FDA discovered during its

inspection of Akorn's Decatur, Illinois facility in April and May 2018.

**Materially False and Misleading**
**Statements Issued During the Class Period**

18.     The Class Period begins on May 2, 2018.  On that day, the Company filed a Form 10-Q for the quarter ended March 31, 2018 (the "1Q 2018 10-Q") with the SEC, which provided the Company's first quarter 2018 financial results and position. The 1Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2018. The 1Q 2018 10-Q was signed by Defendant Portwood.

19.     The 1Q 2018 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     The 1Q 2018 10-Q provided the following risk disclosure that Akorn is subject to federal law and regulations:

> We are subject to extensive government regulations which if they change and or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities

21.     On August 1, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 (the "2Q 2018 10-Q") with the SEC, which provided the Company's second quarter 2018 financial results and position. The 2Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2018. The 2Q 2018 10-Q was signed by Defendant Portwood.

22.     The 2Q 2018 10-Q contained signed certifications pursuant to SOX by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.     The 2Q 2018 10-Q provided the following risk disclosure that Akorn is subject to federal law and regulations:

> We are subject to extensive government regulations which if they change and or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities.

24.     On November 6, 2018, the Company filed a Form 10-Q for the quarter ended September 30, 2018 (the "3Q 2018 10-Q") with the SEC, which provided the Company's third quarter 2018 financial results and position. The 3Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2018. The 3Q 2018 10-Q was signed by Defendant Portwood.

25.     The 3Q 2018 10-Q contained signed SOX certifications by Defendants Rai and Portwood attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.     The 3Q 2018 10-Q stated the following concerning Akorn's Decatur, Illinois manufacturing facility:

> The decline in the gross profit percentage was principally due to unfavorable product mix shifts primarily driven by the effect of competition on Ephedrine Sulfate Injection, unfavorable variances due to decreased production resulting from a planned maintenance shutdown at our Decatur manufacturing facility during the quarter ended September 30, 2018, as well as increased operating costs associated with FDA compliance related improvement activities.

27.     That same day, in lieu of an earnings conference call, Akorn issued the following press release in connection with its third quarter earnings, noting that it had received a Form 483 at the conclusion of the FDA's inspection of its Decatur, Illinois facility in May 2018:

> Akorn Provides Third Quarter 2018 Results
>
> LAKE FOREST, Ill., Nov. 06, 2018 (GLOBE NEWSWIRE) -- Akorn, Inc. (Nasdaq: AKRX), a leading specialty generic pharmaceutical company, today announced its financial results for the third quarter of 2018.
>
> **Business Highlights**
>
> - Revenues declined predominantly due to the effect of competition on key products such as Ephedrine Sulfate Injection, Lidocaine Ointment, Methylene Blue Injection and Nembutal
>
> - In the third quarter of 2018, the decrease in revenues due to pricing was approximately 3% compared to the same period in 2017, the lowest drop in the

trailing six quarters

- Overall portfolio well-balanced and diversified with no product contributing greater than 10% of total revenues

- Received six new ANDA approvals and launched three new ANDAs in the first 10 months of 2018

- Completed construction of new laboratory facilities at Decatur and Somerset manufacturing sites

- Completed installation and qualification of serialization equipment on all required packaging lines ahead of FDA's November 2018 enforcement deadline for the Drug Supply Chain Security Act

- Continued to make progress on FDA action items and milestones as a result of recent inspections of our facilities in Decatur and Somerset, as well as data integrity assessments and remediation globally

\* \* \*

**Frequently Asked Questions**

While we are not hosting a 3Q earnings call, we understand that investors have many questions about our business. Below are answers to the more frequently asked questions.

**What is serialization or the Drug Supply Chain Security Act ("DSCSA")? Why was the serialization project notable for Akorn?**

Among other requirements, the DSCSA requires manufacturers to add a unique serial number to the unit of sale for each prescription pharmaceutical product. In order to comply with this new requirement, Akorn and its contract manufacturing partners needed to install and qualify new equipment on each and every packaging line. Akorn has incurred capital costs of approximately $50 million to date, and expects to spend up to $10 million more in late 2018 and 2019 to complete the customer requirements for data aggregation in its warehouses.

**Akorn's capital expenditures in recent years have been much higher than historical spending. What level of spending should we expect going forward?**

The higher spending was due to large discrete projects such as serialization, new quality control laboratories and facility modernization activities in Decatur and India. Going forward, we expect capital spending to be below the 2018 run rate.

**Can you provide an update on your ANDA pipeline?**

As of October 31, 2018, Akorn had 62 ANDAs pending at the FDA, representing approximately $6.8 billion in annual branded and generic market value according

to IQVIA.

**What is the latest on the recent FDA inspections of Akorn's Decatur and Somerset facilities?**

*Our Decatur facility received a Form 483 at the conclusion of an FDA inspection in May 2018, to which we submitted a robust response in early June. We have made substantial progress (approximately 80% of our action items are complete) and we are on track to complete the majority of the remaining action items by the end of 2018.*

Our Somerset facility received a Form 483 following an FDA inspection ending in August 2018, to which we submitted a robust response in late September. We are on schedule with our action items and have made good progress already with approximately 45% of our action items completed.

**What costs has Akorn incurred in connection with the assessments and remediation activities related to data integrity?**

Year to date in 2018, we have incurred expenses of $23.7 million ($22.4 million charged to SG&A, $1.3 million to cost of goods) on the data integrity assessment and remediation efforts.

(Emphasis added.)

28.    The above statements identified in ¶¶18-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) the Company's Decatur, Illinois facility exhibited severe manufacturing violations; (2) the Company's response to the FDA's Form 483, which identified certain observations following the agency's inspections of the facility in April and May 2018, would be deemed inadequate; (3) the Company repeatedly failed to correct manufacturing violations at its Decatur, Illinois facility; (4) the manufacturing violations, as well as the Company's response to the FDA, would subject the Company to increased regulatory scrutiny; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

29.    On January 9, 2019, before the market opened, Akorn announced that it had received a warning letter "dated January 4, from the U.S. Food and Drug Administration (FDA)

related to an inspection of its Decatur, Illinois manufacturing facility in April and May of 2018."
The warning letter from the FDA detailed a laundry list of "significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals," stating, in pertinent part:

> Dear Mr. Rai:
>
> The U.S. Food and Drug Administration (FDA) inspected your drug manufacturing facility, Akorn, Inc. at 1222 West Grand Avenue, Decatur, IL, from April 9 to May 16, 2018.
>
> This warning letter summarizes **significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals.** See 21 CFR, parts 210 and 211.
>
> **Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your drug products are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B).**
>
> **We reviewed your June 7, 2018, response in detail and acknowledge receipt of your subsequent correspondence.**
>
> During our inspection, our investigators observed specific violations including, but not limited to, the following.
>
> 1. **Your firm failed to follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes (21 CFR 211.113(b)).**
>
> *Poor Aseptic Behavior*
>
> Operators displayed poor aseptic practices during aseptic set-up and filling operations. For example:
>
>   a. Operators placed their head and upper torso inside the filling cabinet during interventions and performed interventions over open vials without clearing them.
>
>   b. Operators excessively handled sterile stopper bags before introduction into the stopper chute in the ISO 5 filling cabinet. Specifically, operators removed the outer secondary layer (sterility barrier) and manually handled the sterile single-layer bag. These stopper bags were then re-placed on the non-sterile shelving units located in the ISO 7 area for extended periods of time. During this time, operators unnecessarily touched and manipulated the bags. These bags are

subsequently introduced into the stopper chute located in the ISO 5 filling cabinet. Notably, your procedures specifically prohibit manipulation of the stoppers once the outer bag has been removed.

In addition, operators shook stopper bags inside the ISO 5 area and the bag also contacted the interior of the stopper chute (critical product contact surface) during the loading process. Your procedures specifically prohibit agitating and shaking during loading.

Personnel also failed to disinfect stopper bags prior to their introduction into the ISO 5 area, again, as required per your procedure.

    c.   Operators placed sterile wipes on a ledge below the filling line and later used the same wipes to clean the interior of the ISO 5 filling area cabinet doors and part of the filling area machine where open sterile vials were exposed.

    d.   Interventions require a large door to be opened. When opened, the door is exposed to the ISO 7 area, and when being closed, there is a significant risk of the lower quality room air sweeping into the ISO 5 filling cabinet. Empty sterile vials are located extremely close to the door. In addition, although operators wiped the open door after interventions were complete, the wiping was vigorous, only disinfected part of the door, and was performed while closing the door. The line design and operator practices both contribute to an unacceptable risk of contamination of the open sterile vials.

In addition, certain interventions performed on the ISO 5 filling line were not documented in your intervention log records, as per your procedures.

*Non-Integral Cleanroom Materials*

Our investigators observed non-integral packages containing sterile gloves. Packages were also observed to contain foreign matter, such as fibers. These gloves, purported to be sterile, are worn by aseptic manufacturing operators who perform critical interventions and can present a contamination hazard to your products. Examples of such interventions include making aseptic connections, clearing jammed and fallen vials, adjusting sterile production equipment, and changing environmental monitoring plates.

In another instance, our inspection found holes in the secondary packaging layer of your sterile wipes. Your firm assumed the outer layer provided a sterile barrier for the primary, interior package. Only by contacting the supplier during our inspection did you learn that the outer layer is not a sterile barrier. Firm management acknowledged the primary layer is never disinfected before use in the cleanroom. Further, your supplier qualification protocol remains insufficient, and your supplier qualification program does not require you to ensure the suitability of this supplier.

*Inadequate Cleanroom Design and Smoke Study Deficiencies*

Your stopper hopper leans diagonally over the top of the filling line during stopper loading operations, thereby blocking first air over open, exposed sterile vials.

In addition to this inadequate design, your smoke studies performed for your ISO 5 areas also lacked simulation of multiple critical interventions that occur during aseptic manufacturing operations.

Thorough smoke studies are essential to evaluate the effects of such interventions on unidirectional airflow and to ensure design modifications are made wherever necessary.

The ISO 5 area is critical because sterile product is exposed and therefore vulnerable to contamination. Your aseptic filling process should be designed, and operations executed, to prevent contamination hazards to your sterile product. The flawed design of the filling line and execution of the aseptic operations promote influx of contamination into the critical filling areas.

***Your firm's response is inadequate. We acknowledge you engaged a third party to assist in efforts to re-train personnel and provide additional oversight of aseptic practices, and that you are revising procedures. You also stated that you are installing restricted air barrier systems (RABS), as previously committed in 2016. You state that you plan to perform supplemental smoke studies for interventions not captured in the current studies and additional smoke studies once you install the new RABS.***

However, you did not provide a sufficient evaluation of all batches produced under inadequate conditions. You also did not commit to extensive redesign of your aseptic process operation.

In response to this letter, provide:

- A comprehensive, independent identification of all contamination hazards with respect to your aseptic processes, equipment, and facilities. Include an independent risk assessment that covers, among other things, all human interactions with the ISO 5 area, equipment placement and ergonomics, air quality in the ISO 5 area and surrounding room, facility layout, personnel flow, and material flow.

- A detailed corrective action and preventative action (CAPA) plan, with timelines, to address the findings of the contamination hazards risk assessment. Describe how you will significantly improve aseptic processing operation design and control and personnel qualification.

- Your plan to ensure appropriate aseptic practices and cleanroom behavior during production. Include specific steps to ensure routine and effective supervisory oversight for all production batches. Describe the frequency of quality assurance

oversight (e.g., audit) during aseptic processing and other operations. Also, provide your protocol and an update on your third party's independent assessment of your aseptic practices. As part of your assessment, summarize your review of past processing videos.

- A thorough risk assessment that evaluates how poor aseptic technique and cleanroom behavior, such as those observed during the inspection, may have affected quality and sterility of your drugs.

- A description of the extent of the missing batch record entries for interventions performed. Detail how you will remediate your system for recording interventions while also not adding further contamination risks to your products.

- A review of your supplier qualification, monitoring, and maintenance program to ensure you adequately address the quality of the materials brought into the cleanroom. Include a review of all materials, including but not limited to, disposable materials (e.g., sterile gloves and wipes) to ensure integrity and prevent contamination in the aseptic processing operation.

- A copy (e.g., a video file) of your new smoke study recordings and a detailed description or schematic of the RABS extension used to provide local protection of the stopper hopper area. Provide an independent assessment of the smoke studies.

2. **Your firm failed to perform operations within specifically defined areas of adequate size and to have separate or defined areas or such other control systems necessary to prevent contamination or mix-ups in aseptic processing areas (21 CFR 211.42(c)(10)).**

*Environmental and Personnel Monitoring*

**Your environmental monitoring program is deficient.** Your procedures allowed personnel performing aseptic interventions in the ISO 5 cabinet to have one colony-forming unit (CFU) on their gloves on a repeated basis without triggering an appropriate response. Your action limit for this location was two CFUs, and you had no alert limit. You lacked scientific justification for your limit and the associated procedure.

In addition, personnel were observed sanitizing their hands with isopropyl alcohol prior to personnel monitoring. Sanitizing gloved hands just before sampling is unacceptable because it can prevent microbial recovery and it undermines the reliability of personnel monitoring data.

***Your response is inadequate. While you commit to evaluate your environmental monitoring program, your target completion date is December 31, 2019. You commit to tighten the glove limit for personnel monitoring, but only after "critical" interventions in the ISO 5 areas. Growth observed on glove samples taken from personnel performing any activities within the ISO 5 area should trigger an alert or action condition that, at a minimum, should lead to trending***

*and may indicate the need for further investigation. Notably, your SOP identifies numerous interventions, defined as major and minor, which require extensive activities within the ISO 5 zone. Any personnel who perform activities within the ISO 5 area should meet your tightened glove limit.*

In response to this letter, provide:

- A comprehensive, independent, retrospective review of your personnel and environmental monitoring program. Include a risk assessment of personnel and environmental monitoring data since April 2015. Indicate the changes you will make to your program to ensure it provides meaningful information by robustly detecting and responding to microbial data from your classified areas. Provide an updated timeline for implementation of your program and procedural changes.

- The most recent revision of your "Environmental Site Selection and Justification" document.

*Cleaning Operations*

Your cleaning program is deficient. While operator entries in sanitization records state that all required sanitization steps were completed in cleanrooms, many steps were actually skipped, and various pieces of equipment were not sanitized.

Your operators did not ensure the mop makes proper contact with the floor. Mops were not wetted frequently to ensure adequate coverage. For example, an operator cleaned the walls surrounding Line AH for several minutes without rewetting the mop.

*In your response, you stated that you have performed targeted training on sanitization procedures. Further, you note that your disinfectant efficacy program demonstrates the ability of your agents to reduce bioburden. Your response is inadequate. You are not consistently following your validated procedures.*

*Although you acknowledge that all disinfection activities had not been completed, you have not determined the scope of these poor practices observed at your facility, including identifying employees involved and how long this has been occurring. You did not extend your investigation to determine if complete disinfection activities and proper documentation practices were followed.*

In response to this letter, provide:

- The investigations and CAPAs initiated in response to the cleaning and disinfection observations by our investigators. Provide updated cleaning and disinfection forms.

- A comprehensive evaluation of the design, control, maintenance, and oversight of your cleaning and disinfection program.

- An overall management strategy that describes how your executive management will oversee improvements in design and execution of manufacturing operations and ensure ongoing scrutiny to enable sustainable quality assurance.

3. **Your firm failed to follow a written testing program designed to assess the stability characteristics of drug products and to use results of such stability testing to determine appropriate storage conditions and expiration dates (21 CFR 211.166(a)).**

You cannot ensure the stability of your product, acetylcysteine injection 200 mg/mL, because you have not performed L-Cystine and L-Cysteine impurity testing on stability samples since 2016. At the time of the inspection, you also did not have a validated test method.

Your 2016 annual report for acetylcysteine injection 200 mg/mL to the agency notes that the L-Cystine and L-Cysteine impurity tests are pending for stability samples. However, the tests are not included in the 2017 annual report. Your 2017 internal stability report states "NO TEST" for both impurity tests.

We acknowledge that you filed a field alert report during the inspection and initiated a recall of all lots of acetylcysteine injection 200 mg/mL on June 22, 2018, because the specification could not be confirmed over the shelf-life. We also acknowledge you filed a supplement to revise the test method.

***In your response, you state no other stability testing issues were noted with FDA-approved test methods. Your response is inadequate. You did not include such an evaluation for your other marketed products (irrespective of whether you hold a drug application).***

In response to this letter, provide a comprehensive assessment and CAPA to ensure the adequacy of your stability program. Your CAPA should include, but should not be limited to, a remediated standard operating procedure (SOP) describing your stability program; stability-indicating methods; stability studies to support each drug product in its container-closure system before distribution is permitted; an ongoing program in which representative batches of each product are added each year to the program to determine if the shelf-life claim remains valid; and specific attributes to be tested at each station. The stability program should ensure the suitability and validation of your analytical methods, and requirements to assess impact of insufficient methods on marketed products.

\* \* \*

**CGMP Consultant Recommended**

Because you failed to correct repeat violations, we strongly recommend engaging a consultant qualified as set forth in 21 CFR 211.34, to assist your firm in meeting CGMP requirements. We recommend that the qualified consultant perform a comprehensive audit of your entire operation for CGMP compliance and evaluate the completion and effectiveness of corrective actions and preventive actions.

Your use of a consultant does not relieve your firm's obligation to comply with CGMP. Your firm's executive management remains responsible for resolving all deficiencies and systemic flaws to ensure ongoing CGMP compliance.

**Data Integrity Remediation**

As detailed above, FDA has concerns regarding the accuracy of intervention, sanitization, and other records produced at this facility. Your quality system does not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs you manufacture. See FDA's guidance document, *Data Integrity and Compliance With Drug CGMP*, for guidance on establishing and following CGMP compliant data integrity practices at https://www.fda.gov/downloads/drugs/guidances/ucm495891.pdf.

We acknowledge that you are using a consultant to audit your operation and assist in meeting FDA requirements. In response to this letter, provide the following:

A.    A comprehensive investigation into the extent of the inaccuracies in data, records, and reporting, including results of the data review for drugs distributed to the United States. Include a detailed description of the scope and root causes of your data integrity lapses.

B.    A current risk assessment of the potential effects of the observed failures on the quality of your drugs. Your assessment should include analyses of the risks to patients caused by the release of drugs affected by a lapse of data integrity and analyses of the risks posed by ongoing operations.

C.    A management strategy for your firm that includes the details of your global CAPA plan.

**Conclusion**

Violations cited in this letter are not intended as an all-inclusive list. You are responsible for investigating these violations, for determining the causes, for preventing their recurrence, and for preventing other violations in all your facilities.

If you are considering an action that is likely to lead to a disruption in the supply of drugs produced at your facility, FDA requests that you contact CDER's Drug Shortages Staff immediately, at drugshortages@fda.hhs.gov, and the Center for Veterinary Medicine (CVM) at AskCVM@fda.hhs.gov, or by telephone to 1-888-INFO-FDA (1-888-463-6332) so that FDA can work with you on the most effective way to bring your operations into compliance with the law. Contacting the Drug Shortages Staff also allows you to meet any obligations you may have to report discontinuances or interruptions in your drug manufacture under 21 U.S.C. 356C(b) and allows FDA to consider, as soon as possible, what actions, if any, may be needed to avoid shortages and protect the health of patients who depend on your products.

Correct the violations cited in this letter promptly. ***Failure to promptly correct these violations may result in legal action without further notice including, without limitation, seizure and injunction. Unresolved violations in this warning letter may also prevent other Federal agencies from awarding contracts.***

***Until these violations are corrected, we may withhold approval of pending drug applications listing your facility. We may re-inspect to verify that you have completed your corrective actions. We may also refuse your requests for export certificates.***

After you receive this letter, respond to this office in writing within 15 working days. Specify what you have done since our inspection to correct your violations and to prevent their recurrence. If you cannot complete corrective actions within 15 working days, state your reasons for delay and your schedule for completion.

(Emphasis added.)

30.     On this news, the Company's share price fell $0.46 per share, more than 11%, to close at $3.48 per share on January 9, 2019, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Akorn securities between May 2, 2018 and January 8, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Akorn's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Akorn common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Akorn or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to

that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Akorn; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

37.     The market for Akorn's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Akorn's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Akorn's securities

relying upon the integrity of the market price of the Company's securities and market information relating to Akorn, and have been damaged thereby.

38. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Akorn's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Akorn's business, operations, and prospects as alleged herein.

39. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Akorn's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

40. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41. During the Class Period, Plaintiff and the Class purchased Akorn's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Akorn, their control over, and/or receipt and/or modification of Akorn's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Akorn, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

43.     The market for Akorn's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Akorn's securities traded at artificially inflated prices during the Class Period. On August 7, 2018, the Company's share price closed at a Class Period high of $19.51 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Akorn's securities and market information relating to Akorn, and have been damaged thereby.

44.     During the Class Period, the artificial inflation of Akorn's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Akorn's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Akorn and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

45. At all relevant times, the market for Akorn's securities was an efficient market for the following reasons, among others:

(a) Akorn shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Akorn filed periodic public reports with the SEC and/or the NASDAQ;

(c) Akorn regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Akorn was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46. As a result of the foregoing, the market for Akorn's securities promptly digested current information regarding Akorn from all publicly available sources and reflected such information in Akorn's share price. Under these circumstances, all purchasers of Akorn's securities during the Class Period suffered similar injury through their purchase of Akorn's securities at artificially inflated prices and a presumption of reliance applies.

47. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is

not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Akorn who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

49.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Akorn's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each

defendant, took the actions set forth herein.

51. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Akorn's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Akorn's financial well-being and prospects, as specified herein.

53. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Akorn's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Akorn and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

54. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

55.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Akorn's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Akorn's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Akorn's securities during the Class Period at artificially high prices and were damaged thereby.

57.     At the time of said misrepresentations and/or omissions, Plaintiff and other

members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Akorn was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Akorn securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     Individual Defendants acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, Individual Defendants had direct and supervisory involvement in the

day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.     As set forth above, Akorn and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: April 22, 2019                              **LAWRENCE KAMIN, LLC**

                                                   **By:  s/ Mitchell B. Goldberg_____**
                                                   Mitchell B. Goldberg
                                                   John S. Monical
                                                   Peter E. Cooper
                                                   300 S. Wacker Drive, Suite 500
                                                   Chicago, IL 60606
                                                   Telephone: (312) 372-1947
                                                   Facsimile: (312) 372-2389

Email: mgoldberg@lawrencekaminlaw.com
jmonical@lawrencekaminlaw.com
pcooper@lawrencekaminlaw.com

**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Vicente Juan*